UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No.  20-CR-10184-RGS |
| | ) | |
| | ) | |
| LUIS ANGEL NARANJO RODRIGUEZ | ) | |

## **MOTION TO SUPPRESS**

Defendant Luis Angel Naranjo Rodriguez has been charged with numerous offenses[1]

relating to the installation of credit card skimmers at various gas stations around New England,

obtaining account information from those skimmers, and then using that account information to

make debit cards that were used to make purchases at stores and cash withdrawals at ATMs. This

entire alleged scheme, and the evidence relied upon by the government to prosecute this scheme,

was uncovered by happenstance when a Concord police officer on patrol encountered Mr.

Naranjo Rodriguez and another man at a Gulf gas station in Concord, MA on November 17,

2019. This encounter, which led to the discovery of phones and skimming devices in the car, the

search of a hotel room where a laptop was discovered that was later searched, and other

evidence, was a violation of Mr. Naranjo Rodriguez's Fourth Amendment rights under the

United States Constitution. The police had no reasonable suspicion to stop and seize Mr. Naranjo

Rodriguez, to conduct a search of his person or to do a protective sweep of the car. As a result,

the evidence discovered on Mr. Naranjo-Rodriguez's person and in the car, as well as the

---

[1] Specifically, Mr. Naranjo Rodriguez is charged with eight counts of wire fraud, in violation of 18 U.S.C. § 1343, four counts of bank fraud, in violation of 18 U.S.C. §1344(2), four counts of aggravated identity theft, in violation of 18 U.S.C. §1028A, one count of possession of fifteen or more counterfeit and unauthorized access devices, in violation of 18 U.S.C. §1029(a)(3), and one count of illegal possession, production, and trafficking of device-making equipment, 18 U.S.C. §1029(a)(4).

additional evidence derived from that evidence, must be suppressed. Mr. Naranjo Rodriguez requests an evidentiary hearing on this motion.

FACTS[2]

I.      *Arrest of Mr. Naranjo Rodriguez on November 17, 2019 at the Concord Rotary Gulf*

At approximately 1:05 AM on November 17, 2019, Sergeant Timothy Landers of the Concord Police Department was driving his police cruiser near the rotary on Route 2 in Concord. He saw a car parked at a gas pump at the Concord Rotary Gulf gas station. Sergeant Landers knew that the gas station closed at 11:00 PM, and that credit card skimming devices had been found on the gas pumps at this gas station in the past. According to other police reports described in more detail below, that past incident occurred in April 2019.

Sergeant Landers pulled into the gas station and parked at an angle behind the car, which was a black Ford Explorer with Colorado license plates. Landers saw a person in the driver's seat of the car.

Landers exited his cruiser and saw another person, later identified as Mr. Naranjo Rodriguez, standing by the gas pump. Landers asked Naranjo Rodriguez what he was doing. Naranjo Rodriguez hesitated and when he turned around, Landers saw he was holding a wallet and a credit card. Naranjo Rodriguez was wearing black rubber/latex gloves, and he told Landers he was getting gas. Landers asked why he was wearing rubber gloves and Naranjo Rodriguez said because he was getting gas. Landers told the Naranjo Rodriguez to move away from the

---

[2] The facts recounted here are based on information contained in discovery provided by the government and summarized in the attached Affidavit of Counsel. By citing these facts in his motion, defendant does not necessarily endorse them as true. Defendant encloses the Concord and Acton Police reports pertaining to the November 17, 2019 arrest as Exhibit A.

2

pump, but he did not move. Landers told him again to move, and then Naranajo Rodriguez said something in Spanish, making it apparent he spoke only a little English.

Landers then took Naranjo Rodriguez by the arm, "directed" him away from the pump and conducted a pat frisk. Landers took a Florida ID card out of his pocket, which bore Naranjo Rodriguez's name. Landers ordered Naranjo Rodriguez to sit on the curb and called for back up. Landers asked the driver of the car where they were coming from, and the driver replied in Spanish. Naranjo Rodriguez said they were going to Boston from Lowell and that they were going to the airport.

At this point, Detective Keith Harrington and Officer Brown of the Concord Police Department and Acton Police Officer Kurt Correia arrived at the gas station. Sergeant Landers ordered Naranjo Rodriguez to leave his wallet on the ground and to keep his hands out of his pockets. One of the police officers ordered Naranjo Rodriguez to his feet, ordering him at the same time to place his hands above his head. Naranjo Rodriguez appeared "puzzled" and said "que," the Spanish word for "what." Naranjo Rodriguez was patted down again (nothing was found). Officer Correia began speaking to Naranjo Rodriguez in Spanish. He asked Naranjo Rodriguez what his name was, and Naranjo Rodriguez said "Luis." He mumbled something the officer could not understand when asked for his last name. When Officer Correia asked Naranjo Rodriguez where he was from, he said he was from Miami and visiting a friend in Lowell. He told Officer Correia that the other person in the car was his friend from Miami. When Officer Correia asked Naranjo Rodriguez what he was doing at the gas station, Naranjo Rodriguez again said he was getting gas.

As Sergeant Landers went to check on Detective Harrington, he noticed a key in the lock to the gas pump where Naranjo Rodriguez had been standing. Harrington also noticed the keys

inside the pump and that the door was slightly ajar. At that point, Naranjo Rodriguez was handcuffed and placed in the back of a cruiser.

Meanwhile, Officer Brown approached the driver of the car, who provided a Florida driver's license with his name, Javier Gamez Rodriguez. Gamez Rodriguez spoke very little English. He was ordered out of the car. Landers checked under the driver's seat and saw a device identified by Detective Harrington as a credit card skimming device. Gamez Rodriguez was handcuffed and put in the back of a police cruiser.

Detective Harrington then proceeded to search the car. He opened the glovebox and found four more credit card skimming devices,[3] as well as multiple pairs of black latex gloves similar to the ones Mr. Naranjo-Rodriguez was wearing. He opened the sunglass holder, and found seven credit cards in seven different names. He also found a set of keys in the cup holder. A red iPhone was mounted on the car's dashboard with a GPS application active. Two additional phones were found in the cup holder next to the gear shirt: a red iPhone with a black "De Walt" sticker on the back and a black Samsung cell phone.

The car was towed from the gas station. Concord police completed an inventory record listing the items found in the car: one skimming device located under the front passenger seat and three in the glove box.[4]

At the police station, bail was set at $100,000 for both Gamez Rodriguez and Naranjo Rodriguez. They were charged and appeared in Concord District Court on Monday, November 18, 2019.[5] Naranjo Rodriguez was held at the Middlesex County jail in Billerica until his case

---

[3] The skimming devices found in the car were later examined by the U.S. Secret Service, without a warrant. No credit card information was found on any of the skimmers.

[4] Handwritten notes on the back of the inventory form also list keys and two cell phones in the center console, as well as black latex gloves in the glove box. A copy of the Motor Vehicle Inventory Record completed on November 17, 2019 is attached as part of Exhibit A.

was adopted by the U.S. Attorney's Office, at which time he was placed in the custody of the U.S. Marshals following his initial appearance in this Court on March 9, 2020.

II.      *Additional Evidence Obtained as a Result of the Car Stop on November 17, 2019*

At the police station, Mr. Naranjo Rodriguez was read his Miranda rights and invoked his constitutional right to remain silent. Mr. Gamez Rodriguez, on the other hand, did speak to the police. Among other things, Gamez Rodriguez told the police Naranjo Rodriguez offered to pay him to come to Massachusetts to drive him around. He said he had no knowledge of the skimming devices. He also told the police that they were staying in a "Hotel 6 somewhere in Boston." Neither Naranjo Rodriguez nor Gamez Rodriguez had any hotel key in their personal property.

Gamez Rodriguez also gave the police his cell phone, a red iPhone 8, and gave them his passcode. Officer Luke Rennie observed two "significant locations" in Massachusetts in the location services section of the phone – one in Hopkinton and one in Sturbridge.

With this information from the phone and the information from Gamez Rodriguez, Officer Rennie contacted the Motel 6 in Framingham and learned that "Luis Rodriguez" was staying in room 328 of the motel. The hotel operator gave a basic description of the Luis Rodriguez who was renting the room and told the police that Luis's brother called the hotel to say that Luis had been in an accident and would not be returning to the hotel. The police advised the hotel operator not to let anyone into the room or to give keys to the room to anyone. The hotel operator agreed to deactivate all room keys and restrict access to the room until the police

---

[5] Gamez Rodriguez's bail was subsequently lowered to $5,000, which he posted. He was never prosecuted in federal court for offenses relating to his arrest on November 17, 2019. On March 9, 2020, Gamez Rodriguez received a "Guilty file" disposition in Concord District Court on one charge of possession of identity fraud tools, and seven counts of receiving stolen credit cards.

contacted her again. The hotel later told the police that a person named Enrique Enriquez extended the reservation on room 328 until November 22, 2021.

Later on the same day of Naranjo Rodriguez's arrest, Concord police obtained a search warrant from the Concord District Court authorizing them to search Room 328 of the Motel 6 in Framingham. In Detective Sergeant Jeffrey Young's affidavit submitted in application of that search warrant, he described the events leading up to Naranjo Rodriguez's arrest, as laid out above.[6] He further described Gamez Rodriguez's statement to the police, and Officer Rennie's conversation with staff at the Motel 6 in Framingham. That search warrant was executed that same day, and the police found, among other things, $1,470 in cash, a hot glue gun, wire cutters, wire remnants, a soldering tool, shoes, bags, perfume, watches and sunglasses, receipts, two SIM cards, as well as a Dell laptop, two Apple watches, and two iPads. [7]

The police also obtained search warrants for the phones found in the car on November 17th. On November 21, 2019, Detective Sergeant Young obtained a search warrant for the red iPhone with the DeWalt sticker on it from the Concord District Court.[8] Young submitted the affidavit in application of the warrant, in which he again relayed the events leading up to Naranjo Rodriguez's arrest on November 17, 2019, the search of the car during which the phone was found in the cup holder, as well as Gamez Rodriguez's statements to the police on November 17, 2019 and Officer Rennie's conversation with Motel 6 that night. On January 2, 2020, Detective

---

[6] A copy of the search warrant, affidavit and return for Room 328 of the Motel 6 in Framingham are attached as Exhibit B.

[7] As described below, the Dell laptop was later searched pursuant to a search warrant. The two SIM cards, found inside a Bible in the motel room, were later searched pursuant to search warrants issued by the Concord District Court. According to extraction reports produced by the government in discovery, there was no information on the SIM cards. The two Apple watches and one of the iPads appeared to be brand new and still in boxes. As far as defense counsel is aware, the two Apples watches and two iPads found in the motel room were never searched.

[8] A copy of the search warrant, affidavit and return for the red iPhone with the DeWalt sticker are attached as Exhibit C.

Keith Harrington obtained a search warrant for the black Samsung phone from Concord District Court.[9] Harrington similarly described the leading up to Naranjo Rodriguez's arrest and the discovery of the black Samsung phone inside the car on November 17, 2019. Gamez Rodrguez's statements to the police that night were also described, as well as Officer Rennie's conversation with Motel 6 that night.

When the Secret Service examined the black Samsung phone, they discovered 4,878 account numbers in incoming SMS text messages. The phone number for the red iPhone with the DeWalt sticker appeared in the call log of the black Samsung phone. In addition, there was a stored GPS location near the Motel 6 in Framingham on November 2, 2019 found in the phone. Secret Service also examined the red iPhone with the DeWalt sticker. No account numbers were found on this phone, but the Wi-Fi connection history showed connections including the Framingham Motel 6 on November 16, 2019.

The government also obtained search warrants for location data maintained by T-Mobile for these two phones. Only the warrant for location data of the red iPhone with the DeWalt sticker was executed. Detective Harrington submitted the application for the search warrant to the Concord District Court on January 21, 2020.[10] In his affidavit, Harrington again described the events surrounding Naranjo Rodriguez's arrest on November 17, 2019, including discovery of the red iPhone with the DeWalt sticker in the cup holder of the car, and that Naranjo Rodriguez gave 786-333-5812 (the phone number for this phone) as his phone number at booking. Harrington also describes the results of the search of the room at the Motel 6 in

---

[9] A copy of the search warrant, affidavit and return for the black Samsung phone are attached as Exhibit D.

[10] A copy of the search warrant, affidavit and return for records from T-Mobile, including the cell site location information, for the red iPhone with the DeWalt sticker (referenced as phone number 786-333-5812), are attached as Exhibit E.

Framingham. He describes records obtained from the Motel 6 showing prior stays by Naranjo Rodriguez on various dates in 2019. Harrington also describes how the items found in the motel room were purchased with stolen credit card numbers, and the credit cards found in the car on the night of Naranjo Rodriguez's arrest contained stolen credit numbers as well.

The records from T-Mobile, produced pursuant to this warrant, showed cell phone tower usage near Naranjo Rodriguez's home in Hialeah, Florida. The records also showed cell tower connections in the area of the Framingham Motel 6 on November 2, 2019, as well as on various dates on July 9-July 13, 2019, September 20-September 28, 2019, October 21-October 24, 2019, October 13-November 4, 2019, and November 14-November 16, 2019. The records also showed a tower connection near a Gulf gas station in Raynham, MA in September 2019, and near a Mobil gas station in Malden, MA in October 2019.[11]

The police also received a search warrant for the Dell laptop found in the motel room. Detective Kallie Koppenal of the Concord Police Department was granted this warrant on December 4, 2019 from the Concord District Court.[12] In her affidavit, Koppenal relays the events of November 17, 2019, as well as her investigation surrounding the discovery of skimming devices found on gas pumps in Concord in April 2019. The affidavit also stated that the credit cards found inside the car on November 17, 2019 were examined by the police, who determined that the credit card account information contained on those cards was stolen via skimming devices found at a Sunoco gas station in Randolph. Three of the cards were used at locations in Framingham on November 16, 2019. The affidavit also described the statements

---

[11] An SMS skimmer was discovered at the Gulf station in Raynham, MA in October 2019. The phone number for that skimmer was found in the text messages found in the black Samsung phone described above, indicating that the skimming device recovered from the Raynham Gulf station had been sending messages to the Samsung phone.

[12] A copy of the search warrant, affidavit and return for records for the Dell laptop are attached as Exhibit F. This exhibit is being filed under seal subject to the protective order in this case (D.E. 13).

made by Gamez Rodriguez on the night of his arrest, which led the police to the Motel 6 in

Framingham. The affidavit describes the execution of the search warrant for the Motel 6 hotel

room, during which the Dell laptop was found. When the police found the Dell laptop, they

opened it up and saw a username to log in to the computer that was displayed as "Luis A

Naranjo." Finally, the affidavit states that Motel 6 provided records pursuant to another warrant

that showed the Naranajo Rodrigeuz had previously rented the same room in the Framingham

Motel 6 on various dates in 2019.

The search warrant on the Dell was executed, and examination of its contents resulted in

the discovery of 386 account numbers[13] in a text file titled "Samsung SM-N950U_SMS_20 I 9 I

027102659." The file indicated date and times of SMS activity, as well as account holder names

and stolen account numbers. Koppenal opines that this file reflects credit/debit card account

information that was stolen via a SMS Skimmer and then transmitted via SMS. In addition,

Naranjo Rodriguez's name appeared numerous times in other files on the Dell laptop. The only

user account file for the laptop was "luis a NARANJO," and the phone number for that account

was listed as the same phone number associated with the red iPhone with the DeWalt sticker.

On November 20, 2019 Detective Sergeant Young obtained recordings of Naranjo

Rodriguez's and Gamez Rodriguez's phone calls from the Middlesex County jail, where they

had been detained since their arrest on November 17th. In a call between Gamez Rodriguez and

a woman on November 19, 2019, the woman told Gamez Rodriguez that "Ricky is going to do

the favor." The woman said she had been arguing with "Laura" about whether or not she should

go as well. The woman also said she did not care about anything else in the room but wanted

"Javie's backpack" returned to her. In a call between Naranjo Rodriguez and a woman on

---

[13] The 386 account numbers found on the Dell laptop were also found on the Samsung phone.

November 18, 2019, the woman said she had withdrawn the money from their TD Bank account and that during the next few days she would withdraw money from other bank accounts. The woman also mentioned that a man had come to her house banging on the door and looking for Luis. Naranjo Rodriguez made a phone call to this same woman again on November 19, 2019. The woman said she was on her way to pick up someone at the Miami airport. She asked about a Movado watch, migraine medication and shoes, all items that were found by the police in the Motel 6 room.

On November 21, 2019, Motel 6 staff contacted the Concord police to let them know that a woman who identified herself as Luis Rodriguez's wife checked into room 331, which was across the hall from room 328. She showed the motel a copy of Luis Rodriguez's birth certificate and asked if she should go into room 328. The woman's identification listed her name as Laura Santana Rodriguez. She had a baby with her and was with an unknown man. Concord police went to the Motel 6 and arrested Laura Rodriguez,[14] who was carrying her and Mr. Naranjo Rodriguez's five-month-old son. The police subsequently obtained a search warrant for room 331 and found airline tickets in Ms. Rodriguez's name and in the name Yoirlan Rojas.

III.    *Prior Incidents of Skimming Devices Found at the Concord Rotary Gulf*

As referenced in Sergeant Lander's report and the various search warrant affidavits described above, the Concord police had discovered skimming devices on the gas pumps at the Conrod Rotary Gulf station prior to Mr. Naranjo Rodriguez's arrest on November 17, 2019.[15]

---

[14] Ms. Rodriguez was prosecuted in the Concord District Court where she was charged with two counts of conspiracy, one count of breaking into a depository, one count of breaking and entering into a building at nighttime to commit a felony, one count of accessory after the fact, and one count of possession of identity fraud tools. On January 31, 2020, the Commonwealth filed a Nolle Prosequi as to all charges against Ms. Rodriguez.

[15] Police reports relating to prior incidents of skimmers found at the Concord Rotary Gulf station are attached as Exhibit G.

Specifically, on April 19, 2019, Concord police were informed that skimmers were found on two gas pumps at the Concord rotary Gulf station. They were led to investigate the pumps at that particular gas station after receiving a complaint from a resident whose credit card had been used to make three unauthorized purchases at stores in Natick on April 11, 2019.[16] Concord police retrieved surveillance footage from the gas station and observed a Nissan SUV enter the gas station at approximately 10:39 PM on April 6, 2019. The footage shows the car idling at several of the pumps and a male passenger exiting and getting back into the car twice.

The police were able to make out the license plate number of the SUV from the gas station footage. The car belonged to Enterprise Rental Company and was rented at Logan Airport from April 5-April 12, 2019 by Yassir Rivera of Miami. Detective Koppenal learned that Yassir Rivera had recently been arrested in Miami on fraud-related charges. A Broward County detective told Detective Koppenal that Yassir Rivera was suspected to be involved in a gas pump skimming operation along with Luis Naranjo-Rodriguez.

Detective Koppenal compared photos of Naranjo Rodriguez with surveillance footage from Enterprise at Logan Airport, and concluded that Naranjo Rodriguez was with Yassir Rivera at the time he rented the Nissan SUV seen at the Concord Rotary Gulf station on April 6, 2019. She also believed the photos of Naranjo Rodriguez matched surveillance obtained of some of the unauthorized purchases reported by residents.

On September 12, 2019, Concord police were called to the Concord rotary Gulf station again for a report of a credit card skimming device found on one of the pumps.

---

[16] Concord police also later received complaints from two other residents whose credit card information was stolen and used to make unauthorized purchases in April 2019.

11

ARGUMENT

All of the events recounted above unfolded as a result of a warrantless, and constitutionally unreasonable seizure of Mr. Naranjo Rodriguez and search of his person. Searches and seizures "conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 454-455 (1971) (internal quotations omitted). The exceptions to the warrant requirement "are jealously and carefully drawn, and there must be a showing by those who seek exemption . . . that the exigencies of the situation" made dispensing with the warrant critical. *Id*. at 455 (internal quotations omitted). Accordingly, the government bears the burden of proving the validity of a warrantless search or seizure. *United States Melendez*, 301 F.3d 27, 32 (1st Cir. 2002). The fruits of an illegal search or seizure must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *Grimaldi v. United State*s, 606 F.2d 332, 336 (1st Cir. 1979). Because "[s]earches that result in no weapons or contraband being found do not – as a practical matter – make it to the courthouse door," the social cost of suppression must be borne in order to "purchase a measure of privacy." *United States v. McKoy*, 402 F. Supp. 2d 311, 314-316 (D. Mass. 2004), *aff'd*, 428 F.3d 38 (1st Cir. 2005). Needless to say, a search or seizure cannot be justified by the evidence discovered as a result of that intrusion. *Wong Sun*, 371 U.S. at 484 citing *Byars v. United States*, 263 U.S. 28, 29-30 (1927). *See also United States v. Di Re*, 332 U.S. 581, 595 (1948) ("[A] search is not to be made legal by what it turns up.").

I.      *Mr. Naranjo Rodriguez Was Seized When the Police Officer Grabbed His Arm, and the Police Lacked Reasonable Suspicion to Seize Him.*

Mr. Naranjo Rodriguez acknowledges that when Sergeant Landers stopped his cruiser and got out to talk to him, he was not seized for purposes of the Fourth Amendment at that point.

"The police … are entitled to approach people and ask questions without always being deemed to have ordered a stop." *United States v. Belin*, 868 F.3d 43, 47-48 (1st Cir. 2017). However, once Landers grabbed Naranjo Rodriguez's arm to move him away from the gas pump, there is no doubt that he was seized. *See Id.*, 868 F.3d at 48 (holding that police had not objectively communicated the use of official authority to restrain the defendant until he grabbed the defendant's arm); *United States v. Zapata*, 18 F.3d 971, 977 (1st Cir. 1994) (stating that seizure occurred once officer touched the defendant's arm). As the Supreme Court has stated, "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877, 20 L. Ed. 2d 889 (1968). The test of whether or not someone has been seized was further explained in *United States v. Mendenhall*: "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S. 544, 554 (1980). In the First Circuit, "To constitute seizure, this Circuit requires one's liberty be restrained by either physical force or an assertion of authority." *United States v. Ford*, 548 F.3d 1, 4 (1st Cir. 2008). "Some physical touching of the person," has been noted as a factor indicating a seizure has occurred. *Mendenhall,* 446 U.S. at 554. The moment Landers took hold of Naranjo Rodriguez's person in order to "direct him" away from the gas pump, he had restrained Naranjo Rodriguez's freedom to walk away. He was seized for purposes of the Fourth Amendment.

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry*, 392 U.S. at 9. Because of this sacred right, in order to justify the seizure of Naranjo Rodriguez, there must be

13

sufficient legal basis for the police to detain him. "The Fourth Amendment rule laid down

in *Terry* permits the police to detain temporarily a suspect on a reasonable suspicion, supported

by articulable facts, that the suspect has committed or is about to commit a crime." *United States*

*v. Scott*, 270 F.3d 30, 41 (1st Cir. 2001). "The officer, of course, must be able to articulate

something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v.*

*Sokolow*, 490 U.S. 1, 7 (1989). At the moment Naranjo Rodriguez was seized by Sergeant

Landers, the following events had transpired:

- A car was parked at one of the gas pumps at 1:05 AM. Sergeant Landers knew the gas station closed at 11 PM.
- Landers knew there had been past incidents of skimmers found at this gas station.
- The car was a black Ford Explorer with Colorado license plates.
- There was a person in the driver's seat of the car, and another person (later identified as Naranjo Rodriguez) standing at the gas pump.
- When Landers asked Naranjo Rodriguez what he was doing, he said he was getting gas. Naranjo Rodriguez was holding a wallet and credit card, and was wearing black latex gloves.
- When Landers asked Naranjo Rodriguez why he was wearing gloves, he said it was because he was getting gas.
- When Landers told Naranjo Rodriguez to move away from the pump, Naranjo Rodriguez did not move. When he told him again, Naranjo Rodriguez said something in Spanish, making it known he spoke only a little English.

These facts do not constitute reasonable suspicion of a crime. Even with the knowledge that

skimmers had been found months earlier at this same location, there was nothing about Naranjo

Rodriguez's behavior that would give rise to reasonable suspicion that he was engaged in any

criminal activity. He was standing next to a car with out-of-state plates, suggesting he might be

unfamiliar with the area and might not have realized the gas station was closed. He was standing

at the pump as someone who is trying to get gas would. He had his wallet and credit card in his

hand, which is also consistent with someone who is trying to buy gas. The fact that he was

wearing latex gloves could be suspicious in some contexts, but is not uncommon for people to do

14

while pumping gas. When asked what he was doing and why he was wearing gloves, Naranjo Rodriguez answered twice that he was getting gas.

When asked to move away from the pump, Naranjo Rodriguez responded in Spanish, indicating his limited ability to converse in English. A person's unfamiliarity with English is not suspicious or indicative of criminal activity in any way. Other courts have found that a person's inability to speak English can be one factor giving rise to reasonable suspicion that a person is the in country illegally, but in the context of other crimes, such an inference amounts to nothing more than improper profiling and biased policing. *Cf. United States v. Manzo-Jurado*, 457 F.3d 928, 936–37 (9th Cir. 2006) ("An individual's ability to speak English may support an officer's reasonable suspicion that the individual is in this country illegally …By itself, however, an individual's inability to understand English will not justify an investigatory stop because the same characteristic applies to a sizable portion of individuals lawfully present in this country."); *see also United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000) ("at this point in our nation's history, and given the continuing changes in our ethnic and racial composition, Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required. Moreover, we conclude, for the reasons we have indicated, that it is also not an appropriate factor"). While a person's inability to speak English may be relevant to a reasonable suspicion analysis near a border, in the context of a *Terry* stop in any other kind of case, it should not be a factor giving rise to reasonable suspicion at all. Put another way, there is nothing suspicious about the fact that a person speaks Spanish and has limited ability to understand English. In fact, in this case, Naranjo Rodriguez's unfamiliarity with English lends further support for the notion that he was somebody trying to get gas and did not realize the gas station was closed.

15

The defense anticipates that the government will rely on the collective knowledge of the Concord Police Department regarding past incidents of skimmers found at this gas station to support Sergeant Lander's reasonable suspicion that Naranjo Rodriguez was engaged in criminal activity. The collective knowledge of the Concord Police Department should be given minimal weight in this particular situation. To start, the observations of Naranjo Rodriguez by Sergeant Landers were in whole innocuous, totally consistent with an out-of-towner trying to get gas, and not suggestive of criminal activity at all. Those facts cannot be overcome by knowledge possessed by another officer relating to an investigation months earlier. The fact that criminal activity occurred in a particular location in the past does not provide reasonable suspicion to detain individuals who are later found in that same location. This premise is especially true in a case where the fellow officer who possesses the relevant knowledge is not a participant in the *Terry* stop in question. The First Circuit has acknowledged that "where law enforcement officers are **jointly involved** in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop." *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002) (internal citations omitted and emphasis added). *Cook*'s application of the collective knowledge doctrine was thus "a far more limited application of the principle, one which takes into account only the knowledge of officers present at the scene and directly involved in effectuating a stop." 277 F.3d at 86. The First Circuit has expressed concern about a broader application of the collective knowledge doctrine, in which knowledge possessed by another officer, not present at the scene, is imputed to the officer involved in the investigative stop: "a broad rendition of the collective knowledge principle could promote illegal searches." *Id.* (citing *United States v. Meade*, 110 F.3d 190, 194 (1st Cir. 1997). Such an approach, sometimes referred to as "horizontal collective knowledge," occurs where "a number of

16

individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause." *United States v. Balser*, 2020 WL 7496097 at *4 (D.N.H. Dec. 21, 2020). Even in these situations courts "must consider whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold." *Id.*; *see also United States v. Alix*, 630 F.Supp.2d 145, 154 (D. Mass. 2009) (noting that the collective-knowledge rule would seem to require, or at least presuppose, the flow of information from the officers with knowledge of facts tending to establish probable cause to those lacking that knowledge"). All Sergeant Landers knew at the time he detained Naranjo Rodriguez is that there had been prior incidents of skimmers found at that gas station, referencing the incident report from April 2019, seven months earlier. While Detective Koppenal had gathered information that led her to believe Naranjo Rodriguez had participated in those prior incidents in April 2019, Detective Landers only seemed to possess vague knowledge that there had been skimmers found at that gas station in the past. He did not know that Naranjo Rodriguez had been identified as a possible suspect. To impute additional information to him, possessed by an officer not on the scene, would essentially excuse and otherwise unconstitutional stop and seizure.

In short, Sergeant Landers jumped the gun, taking physical hold of Naranjo Rodriguez without any more than a hunch that he was engaged in something illegal. The specific and articulable facts in this situation that suggest criminal activity were minimal and did not rise to the level of reasonable suspicion justifying the physical seizure of Naranjo Rodriguez.

II.    *Police lacked a reasonable suspicion that Naranjo Rodriguez was armed and presently dangerous when the officer conducted a pat frisk of his person.*

Even if the police had reasonable suspicion that Naranjo Rodriguez was attempting to place a skimming device on the gas pump – which they did not - this does not automatically supply the authority to frisk him. *United States v. McKoy*, 428 F.3d 38, 39 (1st Cir. 2005) ("After a valid *Terry* stop, a pat-frisk for weapons is also permissible where 'the officer is justified in believing that the person is armed and dangerous to the officer or others.' . . . 'It is insufficient that the stop itself is valid; there must be separate analysis of whether the standard for pat-frisks has been met.'") (internal citations omitted); s*ee also United States v. Am*, 564 F.3d 25, 32 (1st Cir. 2009) (observing that "[t]he district court properly noted that '[t]he reasonable suspicion that permitted the police to stop Am [in reliance on a tip that Am was the triggerman in a recent shooting, knowledge of his gang status, past-criminal conduct, proclivity to carry a firearm, and knowledge that it was uncharacteristic of him to walk unaccompanied in the area] does not automatically give police authority to frisk him attendant to that search."). Instead, an officer's subsequent actions must be "responsive to the emerging tableau – the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." *Am*, 564 F.3d at 32. Thus, in *Am*, the First Circuit found the officer's actions responsive to the emerging tableau where a) police officers exited their vehicle, did not call for backup, and neither unholstered his weapon to suggest the stop would escalate to an arrest; and b) Am did an "about-face" and thrust his hand in his pocket, corroborating the officer's suspicion that Am was engaged in criminal activity and that he might be armed and dangerous, and justifying their decision to conduct a pat-frisk. Similarly in *United States v. Ruidiaz*, 529 F.3d 25 (1st Cir. 2008), the First Circuit affirmed this Court's finding that police officers responding to a 911 call reporting a shooting in progress did not exceed the scope of their initial investigatory

18

stop when they pulled the suspected shooter from a car to pat frisk him after they requested that

he exit the car and he responded by declining to do so and yelling profanity. *Id* at 32-33.

Unlike the facts of *Am* and *Ruidiaz*, there was no "emerging tableau" here. After Sergeant

Landers grabbed Mr. Naranjo Rodriguez by the arm, he immediately conducted what he

describes as a pat frisk. For the reasons articulated above, the police also necessarily lacked

reasonable suspicion that Naranjo Rodriguez was armed and presently dangerous. In cases where

the reasonable suspicion justifying a person's detention is based on suspicion of a violent crime,

that same information without more can support a frisk. *Scott*, 270 F.3d at 41; *Belin*, 868 F.3d at

49 ("Sometimes, however, the reasonable suspicion of a crime that justifies a stop will also

justify a frisk because the very nature of the crime poses a sufficient risk that the stopped

individual is armed and dangerous"). However, that scenario does not present itself here, where

the crime that was being investigated was credit card skimming. There was absolutely no

suggestion of violence or weapons being possessed or used. In *Scott*, *supra*, the First Circuit

considered whether the police had reasonable suspicion to conduct a pat frisk and protective

sweep of the car where the defendant was suspected of passing a bad check. 270 F.3d at 41-42.

The Court held that because there was an "insufficiently particular basis for [the police] to

suspect reasonably that [the defendant] was armed and dangerous," the frisk and sweep were not

legal. *Id.* at 42 (citing *Sibron v. New York,* 392 U.S. 40, 63–66 (1968) ("[To conduct a] self-

protective search for weapons, [an officer] must be able to point to particular facts from which he

reasonably inferred that the individual [searched] was armed and dangerous.")). The Court

specifically rejected an argument that people engaged in fraud "in broad daylight" are likely to

arm themselves, noting that such "logic would seem to permit a frisk on reasonable suspicion of

almost any felony." *Id.* Such is the case here: the police had no reason to suspect anything more

19

than credit card skimming and even that was thin. There was absolutely no basis to conduct a pat frisk.

III.    *The Police Also Exceeded the Permissible Scope of A Pat Frisk, Conducting a Full Blown Search Requiring Probable Cause, Which Was Lacking.*

While Sergeant Landers describes his initial search of Naranjo Rodriguez as a "pat frisk," his search of Naranjo Rodriguez went beyond a pat-down to try to discover weapons. No weapons were found on Naranjo Rodriguez, but Landers states that as a result of this "pat frisk" he removed Naranjo Rodriguez's Florida ID from his pocket. The scope of a pat frisk must be limited to a search for weapons:

> A search for weapons in the absence of probable cause to arrest …
> must, like any other search, be strictly circumscribed by the
> exigencies which justify its initiation. Thus it must be limited to
> that which is necessary for the discovery of weapons which might
> be used to harm the officer or others nearby, and may realistically
> be characterized as something less than a 'full' search, even though
> it remains a serious intrusion.

*Terry*, 392 U.S. at 25–26; *see also Am*, 564 F.3d at 33. There is no credible argument that justified Landers reaching into Naranjo Rodriguez's pocket to retrieve his ID. Such a search clearly goes beyond the permissible bounds of a "pat frisk" and was not justified in this situation where there was no reason to believe Naranjo Rodriguez was armed and dangerous to begin with. Such a search would require probable cause, which the police were lacking under the circumstances for all the same reasons they lacked reasonable suspicion. *See Scott*, 270 F.3d at 39 ("Law enforcement officers have probable cause for a search when "the facts and circumstances within their ... knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" the search will reveal the fruits or instrumentalities of a crime") (internal citations omitted).

IV.     *The Protective Sweep of the Car Was Not Justified.*

After backup arrived, the police saw a key in the gas pump where Mr. Naranjo Rodriguez had been standing and also that the door to the pump was slightly ajar. Naranjo Rodriguez, who had been ordered to sit on the curb by Sergeant Landers and had been doing so, was put in handcuffs and in the back of a police car. He was under arrest at that point. *See United States v. Zapata*, 18 F.3d 971, 975 (1st Cir. 1994) ("The conventional method of classification in respect to such detentions consists of asking whether "a reasonable man in the suspect's position would have understood his situation," in the circumstances then obtaining, to be tantamount to being under arrest"). That left the driver of the vehicle, Mr. Gamez Rodriguez. Officer Brown approached the driver, who, it seems, had remained in the car without incident up until this point. The driver gave Officer Brown his driver's license. Gamez Rodriguez spoke very little English. He was ordered out of the car. The police immediately checked under the driver's seat and found a credit card skimming device. Gamez Rodriguez was placed under arrest. The police continued to search the car, including searching inside the glove box and the sunglass holder.

The search of the car prior to Gamez Rodriguez being arrested was not justified. Because Gamez Rodriguez was not under arrest, the search cannot be considered a search incident to arrest and could only be justified as a "protective sweep." The standard for a "protective sweep" of a car was set out by the Supreme Court in *Michigan v. Long*, 463 U.S. 1032 (1983):

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

463 U.S. at 1049. There was nothing to suggest that either Naranjo Rodriguez, who was at this point in handcuffs and in the back of a police cruiser, or Gamez Rodriguez, who had done nothing to suggest he was armed and dangerous, possessed a weapon.

Similar to a pat frisk, "[w]hen the officer suspects a crime of violence, the same information that will support an investigatory stop will without more support a frisk, and therefore by implication a car search. This Circuit has extended that rule to encompass crimes commonly associated with violence, even though the criminal act itself may be nonviolent; an example is large-scale trafficking in illegal drugs." *Scott*, 270 F.3d at 41 (internal citations omitted). Here, the only crime of which there was any suspicion was not one that implicated violence or any use of weapons. A generalized search for contraband is not a permissible justification for a protective sweep of a car. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law.*" United States v. Lott*, 870 F.2d 778, 783 (1st Cir. 1989). Thus in *Lott*, the First Circuit held that a search directed towards finding contraband, and not for weapons only, was "improper under *Terry* and *Long." Id.* at 785. Here, the police had no justification to search the car for weapons, and a search to look for evidence or contraband in the car was not authorized by law at the point in time when Gamez Rodriguez was ordered out of the car.

   V.   *All evidence derived from the warrantless search and seizure on November 17, 2019 must be suppressed.*

It is well established that "[t]he exclusionary prohibition extends as well to the indirect as the direct products of" unlawful searches. *Wong Sun*, 371 U.S. at 484. In this case, as a result of the unlawful *Terry* stop and search of Naranjo Rodriguez, the police obtained a wealth of

22

evidence. First, they obtained Mr. Naranjo Rodriguez's Florida ID with his name on it. To the extent Detective Koppenal's knowledge from her prior investigation can be imputed to Detective Landers and the other officers on the scene, this piece of evidence is relevant to the basis for subsequent police actions.

After and as a result of the seizure, the police discovered the key in the gas pump, placed Naranjo Rodriguez under arrest, removed Gamez Rodriguez from the car, and searched the car. The evidence found in the car, including the skimming devices, phones, and credit cards, were a "fruit" of the unlawful stop and frisk. That search warrants were obtained to search the red iPhone with the DeWalt sticker and the black Samsung is irrelevant to the analysis as those phones would have never come into the possession of the police if it were not for the unlawful seizure of Naranjo Rodriguez at the gas station.

The arrest of Naranjo Rodriguez and Gamez Rodriguez also led to the discovery of their motel room at the Motel 6 in Framingham. A search warrant was obtained to search the room. The Dell computer was found during that search, and then a search warrant was obtained to search the computer. While the evidence found in the motel room and on the Dell laptop is an "indirect fruit" of the initial illegal search and seizure, it must also be suppressed.

> The indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality. Or, put otherwise, the question whether evidence obtained after an illegal search should be suppressed depends on whether the evidence to which ... objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*United States v. Delgado-Perez*, 867 F.3d 244, 256–57 (1st Cir. 2017) (internal quotations and citations omitted); *see also Wong Sun*, 371 U.S. at 487-88. Here, the search warrant applications rely on the events of November 17, 2019. There is no basis for the warrants independent of the

evidence derived from the unlawful search and search at the gas station. The exclusionary rule

"prohibits the introduction of derivative evidence, both tangible and testimonial, that is the

product of the primary evidence, or that is otherwise acquired as an indirect result of

the unlawful search, up to the point at which the connection with the unlawful search becomes so

attentuated as to dissipate the taint." *Murray v. United States*, 487 U.S. 533, 536–37 (1988)

(internal quotations and citations omitted). The fact that the police later obtained a search

warrants to search the motel room and devices found both in the car and inside the motel room,

does not dissipate the taint of the unlawful seizure of Mr. Naranjo Rodriguez on November 17,

2019 because those search warrant application relied primarily on the evidence obtained as a

result of that unlawful search and seizure on November 17, 2019.

> VI.    *The police went beyond the scope of the search warrant when they unlawfully*
> *searched the Dell laptop found in the motel room.*

The defendant contends that there is an additional reason to suppress the search of the

Dell laptop. The search of the laptop must also be suppressed because the police went beyond the

scope of the search warrant for the motel room when they opened the laptop to view the account

username displayed on the screen. The police later relied on that illegally obtained evidence to

get a separate search warrant to do a more comprehensive search of the laptop and its contents.

*See* Ex. F.

The search warrant for room 328 in the Motel 6 in Framingham was explicit in what it

authorized. *See* Ex. B. Addendum A to the warrant gave the police permission to **search** the

motel room and **seize** evidence of fuel pump and ATM skimming, including electronics such as

cell phones and laptops. *Id.* (emphasis in original). It did not authorize a search of any

electronics.

The opening of the laptop to view the username displayed was a search. *See generally Carpenter v. United States*, 138 S.Ct. 2206, 2213 (noting that "When an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause."). This search went beyond the scope of the warrant for the motel room and thus was unconstitutional. *See Horton v. California*, 496, U.S. 128, 140 (1990) ("If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional"). The information gained from that illegal search must be suppressed and excised from the warrant later obtained for the laptop. *See United States v. Asaro*, 2014 U.S. Dist. LEXIS 84171, *9, No. 12-10196-GAO (D. Mass. June 20, 2014) (writing that when evidence that was obtained in violation of constitutional rights is included in warrant application, suppression is warranted "only if, the 'offending information' being ignored, what remained in the affidavit was insufficient to establish probable cause") (citing *United States v. Dessesaure*, 429 F.3d 359, 367 (1ˢᵗ Cir. 2005); accord *United States v. Zhen Zhou Wu*, 2010 U.S. Dist. LEXIS 4439 (D. Mass. Jan. 21, 2010)). Without that information, and without the information from the unconstitutional encounter on November 17, 2019, no probable cause existed for a search of the laptop.

## CONCLUSION

For the foregoing reasons, all evidence derived from the warrantless search and seizure of Mr. Naranjo-Rodriguez and the car on November 17, 2019, as well as from the unlawful search of the laptop prior to obtaining a warrant to search it, must be suppressed. This Court should grant this motion, or, in the alternative, order an evidentiary hearing.

LUIS ANGEL NARANJO RODRIGUEZ,
By His Attorney,

*/s/Jane F. Peachy*
Jane F. Peachy, B.B.O # 661394
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA  02210
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I, Jane F. Peachy, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on July 9, 2021.

*/s/ Jane F. Peachy*
Jane F. Peachy