UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No.   20-CR-10184-RGS |
| | ) | |
| LUIS ANGEL | ) | |
| NARANJO RODRIGUEZ, | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, by and through the U.S. Attorney for the District of Massachusetts and the undersigned Assistant U.S. Attorney, hereby respectfully opposes Defendant's *Motion to Suppress* (hereinafter referred to simply as Defendant's *Motion*). *See* the Court's Electronic Case File, Docket Entry ("D.E.") 46. Defendant is charged in the Indictment with carrying out a sophisticated scheme to steal credit card information by means of a network of credit card skimming devices hidden in gas pumps at gas stations throughout New England between April 2019 and November 2019. Defendant's scheme ended when he was caught red-handed by the police installing skimming equipment at a gas station in Concord, Massachusetts.

Officers conducted their investigation at the scene, and later at a hotel room where Defendant was staying, within the established boundaries of the Fourth Amendment. Their warrantless intrusions upon Defendant's privacy at the gas station escalated in reasonable intervals as the evidence of Defendant's criminal activity mounted, and officers promptly interposed judicial oversight in their investigation of Defendant's scheme by seeking search warrants. Even should the Court find that the police action infringed upon Defendant's constitutional rights, the application of the exclusionary rule is not warranted because discovery of the incriminating

evidence was inevitable.  Finally, the *Motion* fails to raise any factual dispute that would justify an evidentiary hearing.  There are no grounds, therefore, for any of the relief requested by Defendant, and the *Motion* should be summarily denied.

## FACTUAL BACKGROUND

To the extent that Defendant's recitation of the facts of the case in the *Motion* are not inconsistent with police reports and affidavits upon which it is based, *see* Exhibits A through G of Defendant's *Motion*, D.E. 46-2 through -8, the Government relies upon the same set of facts and will avoid any unnecessary repetition herein.

## ARGUMENT

I.   *Sgt. Landers conducted a lawful* Terry *stop, and the frisk was a justified security measure under the circumstances.  Because Defendant was noncompliant and did not appear to completely understand Sgt. Lander's commands, it was not unreasonable for Sgt. Landers to attempt to ascertain Defendant's identity by retrieving and viewing Defendant's Florida driver license.  Even if Sgt. Landers exceeded the permissible scope of a* Terry *frisk, the discovery of Defendant's identity and incriminating evidence was inevitable.  Similarly, the subsequent police investigation was not tainted by the* Terry *stop or the fact that Sgt. Landers learned Defendant's name from viewing his Florida driver license during the initial frisk.*

a.   The Stop

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court recognized the constitutionality of temporary, warrantless seizures of persons based on less than probable cause.  If a police officer has reasonable suspicion that criminal activity is afoot, he may conduct a stop to investigate.  *Id.* at 30.  Furthermore,

> where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.*

The reasonable suspicion standard requires more than a "mere hunch," but "considerably less" and "obviously less" than probable cause. *See id.* at 27; *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The standard takes into account "the totality of the circumstances – the whole picture." *United States v. Cortez*, 449 U.S. 411, 418 (1981). It is also an objective standard; the officer's subjective motives do not enter into the decisional calculus. *See United States v. Romain*, 393 F.3d 63, 74 (1st Cir. 2004).

Here, there is a specific and articulable basis for Sgt. Landers' reasonable suspicion that satisfies Fourth Amendment strictures. *See Sokolow*, 490 U.S. at 7 (requiring "more than an inchoate and unparticularized suspicion or 'hunch'"). According to Sgt. Landers' account of the events of the early morning hours of November 17, 2019, he observed a motor vehicle parked at a gas pump at the Concord Rotary Gulf gas station when the gas station was already closed. *See* Defendant's *Motion*, Exhibit A, D.E. 46-2, p 6. The motor vehicle, a Black Ford Explorer SUV (hereinafter referred to simply as "the SUV"), bore a Colorado license plate, and the SUV's engine appeared to be running. *Id.* Someone was seated in the driver seat of the SUV, and a second person was outside the SUV standing by the gas pump. *Id*. Sgt. Landers was aware that credit card skimming devices were previously recovered from gas pumps at the Concord Rotary Gulf in connection with an April 2019 investigation, and, since that incident, he had been specifically checking the station for vehicles at the pumps after hours. *Id*. Indeed, the Concord Police Department's investigation had determined that the skimmers found at the Concord Rotary Gulf in April 2019 had likely been installed late at night around the time the gas station closed by two individuals in a rented motor vehicle. *See* Defendant's *Motion*, Exhibit G, D.E. 46-8, pp 4-6.

Defendant was outside of the SUV acting suspiciously at the gas pump. When Sgt. Landers asked him what he was doing, Defendant hesitated before facing the officer and responding.

Defendant's *Motion*, Exhibit A, D.E. 46-2, p 6.  Despite the SUV's engine running and gas station being closed, he claimed he was getting gas.  *Id.*  Sgt. Landers could see that Defendant was wearing dark clothing and black rubber gloves.  *Id.* at 6, 12.  He was also holding a wallet and a credit card.  *Id.* at 6.  Sgt. Landers instructed Defendant to move away from the pump two times.  *Id.*  Defendant did not do so; instead, Defendant said something in Spanish that suggested to Sgt. Landers that he spoke little English.  *Id.*

Defendant's behavior and the overarching facts and circumstances are unusual, and they are also consistent with credit card skimming activity, thus furnishing Sgt. Landers with sufficient suspicion to conduct a *Terry* stop.  *See United States v. Salazar*, 609 F.3d 1059, 1069 (10th Cir.2010); *Foley v. Kiely*, 602 F.3d 28, 32 (1st Cir.2010); *United States v. Summers*, 268 F.3d 683, 687 (9th Cir.2001); *United States v. Walker*, 924 F.2d 1, 4 (1st Cir.1991); *United States v. Landry*, 903 F.2d 334, 337 (5th Cir.1990).  Defendant would have the Court deem Sgt. Landers' suspicion unreasonable because some of Defendant's behavior could conceivably have innocent explanations.  It is well established, however, that the Fourth Amendment does not require

> a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.  On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.

*Adams v. Williams*, 407 U.S. 143, 145-46 (1972).  Common sense and practical considerations must guide the Court's judgment about the reasonableness of the stop.  *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002); *see United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999) ("[F]actors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion.").

In an attempt to bolster his argument, Defendant invokes the specter of an overbroad application of the "collective knowledge" principle. The Court need not share the same concerns.[1] Here, Sgt. Landers encountered Defendant while he was patrolling the gas station for the very purpose of intercepting the installation of credit card skimming devices that he knew had been found at that very gas station in the recent past. Defendant does no dispute that Sgt. Landers personally possessed this knowledge on the night in question. *See* Defendant's *Motion*, p 17. Sgt. Landers' knowledge was specific enough to support his suspicion of Defendant, and, under the totality of the circumstances, the *Terry* stop was reasonable. *See United States v. Pascu*, 2012 WL 2449905, at *5 (D. Mass. June 26, 2012) (Woodlock, J.) (reasonable suspicion to detain the defendant where officer who responded to a tip about an individual repeatedly entering an ATM vestibule in Cambridge, Massachusetts, also knew that there had been a rash of skimming fraud at ATMs in the New England region).

b. The Frisk

The facts and circumstances of a *Terry* stop may justify a protective pat-down of the suspect. *See Terry*, 392 U.S. at 30. "[O]fficers must be allowed, during the course of [a *Terry*] stop, to take measures that are reasonably calculated to protect themselves or others from harm." *United States v. Rasberry*, 882 F.3d 241, 247 (1st Cir. 2018) (citing *Flowers v. Fiore*, 359 F.3d 24, 30 (1st Cir. 2004)). "The officer need not be absolutely certain that the individual is armed; the

---

[1] Defendant's citations to authority are readily distinguishable from the instant case. For example, the First Circuit affirmed the reasonableness of a stop by two officers when they jointly, but not individually, possessed knowledge about the suspect's background and recent activities. *See Cook*, 277 F.3d at 86. Here the Government does not rely on knowledge imputed to Sgt. Landers from other officers at the scene or from an entire law enforcement agency. *See United States v. Meade*, 110 F.3d 190, 194 (1st Cir. 1997). Sgt. Landers' undisputed personal knowledge of the past skimming activity at the Concord Rotary Gulf provided sufficient grounds for reasonable suspicion.

issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that others was in danger." *Terry*, 392 U.S. at 27.

An officer with the authority to perform a *Terry* stop does not automatically have authority to perform a frisk, but the officer's actions may be "responsive to the emerging tableau – the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." *United States v. Am*, 564 F.3d 25, 32 (1st Cir. 2009). Contrary to Defendant's contentions, Sgt. Landers was in fact confronted with an "emerging tableau," albeit a brief one. Initially, Sgt. Landers was alone, late at night, facing two suspects who were potentially breaking into a gas pump at that very moment, and could have had access to a running motor vehicle and tools to use as weapons. *See United States v. Pontoo*, 666 F.3d 20, 30 (1st Cir. 2011) (upholding a frisk for weapons where the defendant was suspected of just having committed a violent crime). These facts alone provided Sgt. Landers with reasons to be concerned for his safety. *See United States v. Tiru-Plaza*, 766 F.3d 111, 121 (1st Cir. 2014) (frisk reasonable where the officers were outnumbered, in relative darkness, and could reasonably believe that they were dealing with the volatile situation of a possible car theft); *cf. United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005) (no basis for frisk where the defendant was the sole occupant of the vehicle and officers made their approach during daylight hours).

After he engaged Defendant, Sgt. Landers learned that Defendant was wearing black latex gloves, was hesitant, noncompliant with verbal commands, and could not – or would not – communicate effectively. For any reasonably prudent person in the circumstances, these developments would enhance the perception that Defendant posed a danger to their safety and might be armed. Accordingly, Sgt. Landers had reasonable grounds to frisk Defendant for weapons. *See United States v. Orth*, 873 F.3d 349, 355-56 (1st Cir. 2017) (frisk was appropriate

where the defendant was stopped in a high crime neighborhood and refused the officer's commands, and the defendant and passengers of the vehicle were behaving suspiciously); *United States v. Soares*, 521 F.3d 117, 121-122 (1st Cir. 2008) (frisk was appropriate where the defendant appeared to be extremely nervous, was uncooperative, and was verbally abusive after being stopped in a high-crime neighborhood); *cf. Pascu*, 2012 WL 2449905, at *2-5 (no lawful basis to frisk the defendant, who was stopped on a public sidewalk during the daytime and was cooperative with law enforcement, and neither the defendant's appearance nor the crime under investigation suggested any danger).

     c.   <u>Removing the Florida Driver License and Viewing Defendant's Name</u>

The Supreme Court has repeatedly emphasized that one of the basic reasons for, and necessarily one of the primary functions of the investigatory stop is to ascertain the identity of the suspect. *See Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cty.*, 542 U.S. 117, 186 (2004). "The ability to briefly stop [a suspect], ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice." *Hayes v. Florida*, 470 U.S. 811, 816 (1985). Accordingly, the boundaries of a permissible *Terry* stop are flexible enough to accommodate law enforcement officers' needs regarding the identification of suspects, and they allow officers to perform background and warrant checks, for instance, even when the inquiry is unrelated to the circumstances that initially roused officers' suspicions. *See Klaucke v. Daly*, 595 F.3d 20, 26 (1st Cir. 2010).

The sole justification for a frisk under *Terry* is for the protection of the police officer and others nearby. *Terry*, 392 U.S. at 29. However, the ultimate touchstone of the Fourth Amendment is reasonableness, and the jurisprudence reflects allowances in exceptional circumstances under many Fourth Amendment principles. *See, e.g., Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (discussing exceptions to the warrant requirement). For instance, while officers will

typically overstep the bounds of a frisk for weapons by seizing different items, they need not necessarily turn blind eyes to every item in a suspect's possession unless they are convinced it is a weapon. *See Minnesota v. Dickerson*, 508 U.S. 366, 376-78 (1993) (describing how an officer may lawfully seize an item other than a weapon if there is probable cause to believe the item in "plain touch" constitutes incriminating evidence).

In this case, Sgt. Landers did not act unreasonably when, during a lawful frisk, he felt Defendant's driver license in his pocket, removed it, and inspected it. Sgt. Landers was certainly entitled to request the information from Defendant, even persistently and intrusively. *See United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988) (holding that the solicitation of information concerning the defendant's identity and background during a prolonged stop was constitutional). When presented with the opportunity to learn Defendant's identity, one of the critical objectives of the stop, it was not unreasonable for Sgt. Landers to bypass a request of Defendant to produce his identification in light of Defendant's apparent inability to communicate in English and his demonstrated noncompliance to that point. Courts have approved the seizure of an individual's identification in the context of a lawful investigatory stop which otherwise satisfied Fourth Amendment requirements, when the individual would not, or could not, provide identification directly to the officer. *See State v. Flynn*, 92 Wis. 2d 427, 446 (1979) (the defendant refused to provide identification); *Harper v. State*, 532 So. 2d 1091, 1094-95 (Fla. Dist. Ct. App. 1988) (the defendant was handcuffed and could not access identification). Sgt. Landers' report, *see* Defendant's *Motion*, Exhibit A, D.E. 46-2, pp 6-7, does not suggest, nor does Defendant claim, that he was fishing for evidence, and the retrieval of the Florida driver license, circumscribed as it was, does not, on its own, transform the frisk into a full-blown search that violated Defendant's constitutional rights.

d.   Inevitable Discovery

Defendant argues that because Sgt. Lander's unlawfully stopped and searched him, all evidence recovered thereafter is tainted and should be suppressed pursuant to the principles of *Wong Sun v. United States*, 374 U.S. 471, 484 (1963), including his Florida driver license with his name on it.  To the extent that Defendant suggests that his identity should be suppressed, that relief is foreclosed by established precedent.  *See United States v. Oscar-Torres*, 507 F.3d 224, 229 (4th Cir. 2007); *Adegbite*, 846 F.2d at 838-39.

Defendant's position is untenable.  Given his knowledge of past credit card skimming activity at the Concord Rotary Gulf and his observations as he arrived there on November 17, 2019, Sgt. Landers' investigation had lawfully commenced before he stopped Defendant and undoubtedly would have proceeded regardless of the outcome of the stop of Defendant.  Evidence leading inexorably to the conclusion that Sgt. Landers had interrupted Defendant in the process of committing a crime was in plain view at the scene.  Defendant and the driver of the SUV would have been arrested, triggering a sequence of events that would have inevitably resulted in the lawful discovery of Defendant's identity and the evidence from the SUV.  Therefore, even if Sgt. Landers did unlawfully stop and search Defendant, the inevitable discovery exception to the exclusionary rule would apply to the evidence Defendant seeks to suppress.

In evaluating whether the inevitable discovery exception applies in a case, the First Circuit has employed a three-part analysis: first, were the legal means by which the evidence would have been discovered truly independent; second, would use of the legal means have inevitably led to the discovery of the evidence; and third, would applying the inevitable discovery rule provide an incentive for police misconduct or significantly weaken constitutional protections." *United States v. Almeida*, 434 F.3d 25, 28 (1st Cir. 2006).  The Government must establish by a preponderance

of the evidence that the information ultimately or inevitably would have been discovered by lawful means. *Nix v. Williams*, 467 U.S. 431, 444 (1984).

The presence of the SUV and Defendant at the Concord Rotary Gulf after the gas station was closed, where credit card skimming activity was discovered in the recent past, prompted an investigation that was independent of the stop of Defendant.   In other words, Landers' investigation was already underway before he stopped Defendant. *See United States v. Silvestri*, 787 F.2d 736, 741 (1st Cir. 1986) (inevitable discovery exception applied to drugs where prewarrant securing of the defendant's premises preceded illegal entry into garage where drugs were first observed); *cf. Gore v. United States*, 145 A.3d 540, 549 (D.C. Aug. 18, 2016) (inevitable discovery exception did not apply where hypothetical search warrant could have, but did not, precede illegal entry into home where incriminating evidence was discovered).  At the inception of the investigation, Sgt. Landers observed Defendant at a gas pump wearing black rubber gloves and holding a credit card in his hand. *See* Defendant's *Motion*, Exhibit A, D.E. 46-2, p 6.  The SUV parked next to the same pump was running, bore out-of-state plates, and had a second person in the driver seat. *Id*.   These are "demonstrated historical facts capable of ready verification or impeachment" that permit the Court to conclude that the discovery of evidence of Defendant's credit card skimming scheme was truly inevitable, without engaging in speculation. *See Nix*, 467 U.S. at 444 n. 5.

Officers were in a lawful position to investigate and make observations at the gas station, a public place where their mere presence did not violate the Fourth Amendment. *Horton v. California*, 496 U.S. 128, 139-40 (1990).  Accordingly, subsequent observations of the gas pump where Defendant was standing were independent and lawful, and they established probable cause to arrest Defendant and the driver of the SUV for Breaking into a Depository, and Breaking and

Entering into a Building in the Night Time with Intent to Commit a Felony Therein, both in violation of Massachusetts General Laws, Chapter 266, Section 16,[2] and Possession of Burglarious Instrument, in violation of Massachusetts General Laws, Chapter 266, Section 49.[3]

Probable cause exists when "the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or *was committing an offense*." *United States v. Maguire*, 918 F.2d 254, 258 (1st Cir. 1990) (emphasis added).  Here, officers observed a set of keys in the lock of the gas pump nearest to Defendant.  *See* Defendant's *Motion*, Exhibit A, D.E. 46-2, p 6.  The outer panel of the gas pump was ajar, exposing the internal computer parts and card reader.  *Id.* at 10, 12.  The digital displays for the same gas pump, which normally indicate the amount of money due as well as the gallons of gas pumped, were zeroed out, unlike the rest of the gas pumps at the gas station.  *Id.* at 10.  Based on all the foregoing, officers

---

[2] M.G.L. c. 266, § 16 states, in pertinent part, that "[w]hoever, in the night time, breaks and enters a building, ship, vessel or vehicle, with intent to commit a felony, or who attempts to or does break, burn, blow up or otherwise injures or destroys a safe, vault or other depository of money, bonds or other valuables in any building, vehicle or place, with intent to commit a larceny or felony, whether he succeeds or fails in the perpetration of such larceny or felony, shall be punished by imprisonment in the state prison for not more than twenty years . . . ."  *See* The 192nd General Court of the Commonwealth of Massachusetts, Section 16: Breaking and entering at night, https://malegislature.gov/Laws/GeneralLaws/PartIV/TitleI/Chapter266/Section16 (last accessed July 30, 2021).

[3] M.G.L. c. 266, § 49 states, in pertinent part, that "[w]hoever makes or mends, or begins to make or mend, or knowingly has in his possession, an engine, machine, tool or implement adapted and designed for cutting through, forcing or breaking open a building, room, vault, safe or other depository, in order to steal therefrom money or other property, or to commit any other crime, knowing the same to be adapted and designed for the purpose aforesaid, with intent to use or employ or allow the same to be used or employed for such purpose . . .  shall be punished by imprisonment in the state prison for not more than ten years . . . ."  *See* The 192nd General Court of the Commonwealth of Massachusetts, Section 49: Burglarious instruments; making; possession; use,     https://malegislature.gov/Laws/GeneralLaws/PartIV/TitleI/Chapter266/Section49     (last accessed July 30, 2021).

had probable cause to believe that they had interrupted Defendant and the driver of the SUV unlawfully entering the gas station facility for the purposes of breaking into the gas pump.

As discussed in greater detail below, once officers gained probable cause and Defendant and the driver of the SUV were placed under arrest, the discovery of incriminating evidence inside the SUV and Defendant's identity was inevitable because of the officers' obligation to inventory the contents of the vehicle and inspect Defendant's identification during the arrest and booking process.   Because officers arrested Defendant and the driver of the SUV for violations of Massachusetts state law unrelated to credit card skimming, they had no incentive to try to obtain evidence of credit card skimming from the SUV through unconstitutional means because they were required to conduct an inventory search of the SUV, anyways.   Therefore, there is little risk that applying the inevitable discovery exception in these circumstances will erode Fourth Amendment protections or encourage police misconduct.  *See Almeida*, 434 F.3d at 29.

e.   Attenuation

Suppression of evidence discovered in connection with the search of Defendant's hotel room is also not appropriate because the evidence is sufficiently attenuated from the *Terry* stop and Sgt. Landers' learning of Defendant's name from his Florida driver license during the initial frisk at the gas station so as to dissipate the taint of any unlawful search or seizure.

The attenuation exception to the exclusionary rule covers the discovery of incriminating evidence that, though indirectly the product of unlawful police conduct, is sufficiently removed from that unlawful conduct so as be "purged of the primary taint."  *See Wong Sun*, 371 U.S. at 488.  To determine if the subsequent evidence is sufficiently attenuated from the unlawful conduct, courts consider three factors: 1) the temporal proximity between the unlawful conduct and the discovery of evidence; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the illegal conduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

As a general principle, where the initial unlawful discovery of information does nothing more than point law enforcement in the direction of a defendant and his criminal activities, subsequently discovered evidence should not be suppressed. *See United States v. Watson*, 950 F.2d 505, 508 (8th Cir. 1991) ("[I]f the information merely facilitates or shortens the subsequent investigation, it does not taint the investigation's results."); *United States v. Hassanshahi*, 75 F.Supp. 3d 101, 112 (D.D.C. 2014) ("Federal courts consistently have held that the exclusionary rule does not apply to subsequently discovered evidence when an initial limited piece of information – typically the name of a potential target for investigation – is obtained through an illegal search or seizure because substantial intervening investigative steps still are required to uncover the necessary incriminating evidence.").

Applying this general principle and the *Brown* factors, it is clear that the officers' discovery of evidence in Defendant's hotel room was sufficiently attenuated from the *Terry* stop and Sgt. Landers' learning of Defendant's name from his Florida driver license because the hotel room search warrant was not executed until many hours had elapsed, there were two critical, intervening investigatory steps, and Sgt. Landers' stop and frisk of Defendant, if improper, was not flagrant misconduct.  The factors favor admission of the evidence in this case.

The lawful search of the SUV and the interviews of the driver of the SUV, Javier Gamez Rodriguez ("Gamez Rodriguez") were significant intervening circumstances.  While Defendant's full name was a lead that helped officers identify where he was staying, the substantive basis for the search warrant for Defendant's hotel room was derived from the evidence seized from the SUV, *see* Defendant's *Motion*, Exhibit B, D.E. 46-3, ¶¶ 12, 16, and from statements by Gamez Rodriguez.  *Id.* at ¶¶ 15, 16, 17-22.  More specifically, Gamez Rodriguez informed officers that he

and Defendant were staying at a Motel 6 near Boston and show them significant locations from his phone, one of which was near the hotel.  *Id*.

Finally, assuming *arguendo* that the *Terry* stop and frisk of Defendant was unlawful, it was hardly flagrant misconduct.  It was not unreasonable for Sgt. Landers to investigate a vehicle parked at a gas pump in a closed gas station where there had been recent past incidents of credit card skimming.  *See Mendez*, 885 F.3d at 912 ("In order for a violation to be 'purposeful or flagrant,' it must be more than just negligent.").  Defendant's noncompliance and inability to communicate were unquestionably aggravating factors.  The *Terry* stop and frisk was motivated in part by officer safety and did not materially aid the investigation.  Moreover, evidence of Defendant's criminal conduct was quickly uncovered during the stop and Sgt. Landers' suspicions were vindicated.  Under the circumstances, the potential illegality of the *Terry* stop and Sgt. Landers' learning of Defendant's name from his Florida driver license do not warrant suppression. *See United States v. Oliver*, 27 Fed. Appx. 927, 929 (10th Cir. 2001) (holding that unlawful arrest did not taint the defendant's subsequent confession where arresting officers prematurely detaining the defendant by a few minutes did not rise to level of flagrant misconduct).

II.     *After making observations of the gas pump and based on their collective knowledge of past credit card skimming activity at the Concord Rotary Gulf, officers had probable cause to believe that the SUV contained evidence of credit card skimming-related crimes.  Therefore, subsequent warrantless searches of the SUV were justified by the automobile exception and the need to conduct an inventory search.*

a.  <u>Automobile Exception</u>

Following Defendant's detention and after Gamez Rodriguez was asked to exit the SUV, both Sgt. Landers and Det. Harrington separately looked in the SUV and observed incriminating evidence.  *See* Defendant's *Motion*, Exhibit A, D.E. 46-2, pp 6-7, 12.  These actions have been variously characterized as a protective sweep and search incident to arrest, respectively, in the submissions to the Court.  What is critical, however, is that no observations of the interior of the

SUV were made until the officers at the scene collectively had probable cause to believe that the SUV contained evidence of a crime.  Defendant does not dispute this important sequence of events. *See* Defendant's *Motion*, pp 3-4.  Accordingly, any warrantless search of the SUV at the gas station was justified under the automobile exception.

The automobile exception permits officers who have "probable cause to believe a vehicle contains evidence of criminal activity," to search without a warrant "any area of the vehicle in which the evidence may be found."  *Arizona v. Gant*, 556 U.S. 332, 347 (2009) (internal citation omitted).  Importantly, the scope of the exception 1) "extends beyond the crime of arrest" and 2) "requires probable cause."  *United States v. Polanco*, 634 F.3d 39, 42-43 (1st Cir. 2011).

As discussed above, officers at the gas station quickly discerned probable cause to arrest Defendant and Gamez Rodriguez for breaking into the gas pump.  Once Det. Harrington arrived on the scene, the officers collectively had knowledge of key facts providing probable cause to search the SUV for evidence of credit card skimming activity: Det. Harrington's familiarity with credit card skimming devices, generally, and his prior investigations of credit card skimming at the Concord Rotary Gulf, specifically, and Defendant's name, which was linked by prior investigations to the gas station.[4]  *See* Defendant's *Motion*, Exhibit A, D.E. 46-2, p 12; Exhibit E, D.E. 46-6, ¶¶ 29-31.

In *United States v. Martinez*, 2012 WL 5842601 (D. Mass. Nov. 16, 2012) (Zobel, J.), the court underlined how the totality of the circumstances supplied probable cause to search an

---

[4] Identification of Defendant as a suspect in the April 2019 investigation of prior credit card skimming at the Concord Rotary Gulf would obviously furnish probable cause to search the SUV.  However, the information was sufficient but not necessary for probable cause.  Even were Sgt. Landers' frisk deemed unlawful and the information from Defendant's Florida driver license excluded, officers still had probable cause to believe that the SUV contained evidence of credit card skimming.

automobile in an analogous case. There, when discovering a vehicle with an occupant inside in the vicinity of suspected burglary activity, officers ordered the occupant to vacate the rental vehicle; the occupant was "handcuffed for officer safety, patted down, and charged with attempted breaking and entering when he could not explain his presence there." *Id.* *1. The court noted key facts about the officers' justification for probable cause: ". . . there was little reason for someone to park on [a residential street] at that hour given that the nearby school and park were closed . . . "[the officers'] attention was drawn to the [vehicle] because they could hear the engine running . . . [and] "[the defendant] was not able to explain his presence there[.]" *Id.* *2. In sum, these "factors [were] sufficient to warrant a reasonable belief that [the defendant] was involved in the attempted break-in that had just occurred." *Id.* The Court went on to outline that the officers were also entitled to the automobile exception "in light of [] earlier events," including "the proximity of the [vehicle] to [the burglarized home] . . . the fact that the engine was running . . . [and that] [the arresting officer] testified that he expected to find burglary tools, such as latex gloves, inside the [vehicle][.]" *Id.* *3.

More particularized facts are before the Court in the instant case than in *Pascu*, where the district court found that there was a "fair probability" that instrumentalities of ATM skimming would be found in the defendant's car. 2012 WL 2449905, *10; *cf. United States v. Gunning*, 405 F. Supp. 2d 79, 83 (D. Mass. 2005) ("existence of probable cause related to *general* criminal activity is not sufficient to justify a warrantless search or seizure of *an automobile*") (emphasis in original). Unlike in *Pascu*, where officers knew of a "rash of 'skimming' fraud at ATM in the New England *region*," *id*. at *5 (emphasis added), Defendant was discovered at the very same gas station that was the subject of an ongoing credit card skimming investigation. Moreover, officers at the Concord Rotary Gulf on November 17, 2019, encountered a "hesitat[ing]" Defendant

standing at a gas pump after hours, wearing black rubber gloves and holding a credit card.  The front panel of the gas pump was unlocked, the digital displays were zeroed out, and the interior electrical components were exposed.  Under the totality of the circumstances, a reasonable person would believe that he was interrupting Defendant committing a crime, and specifically installing a credit card skimming device.  *See Illinois v. Gates*, 462 U.S. 213, 230 (1983).  By comparison, officers stopped the defendant in *Pascu* on the sidewalk outside of the shopping mall, at a distance from both his car and the ATM where the officers found a skimming device and pinhole camera. 2012 WL 2449905, *1.  Accordingly, the circumstances here established probable cause to believe that a search of the running SUV stopped right next to Defendant would yield evidence of the crimes, and further investigation of the SUV on scene by Sgt. Landers and Det. Harrington was proper.  *See id*. at *10 (officers who found a nearby ATM skimmer with a pinhole camera could "reasonably expect that other instrumentalities of ATM skimming, such as a laptop computer, would be necessary to collect and transport the data from the skimmer and pinhole camera"); *United States vg. Panitz*, 907 F.2d 1267, 1272 (1st Cir. 1990) ("[T]he existence of probable cause justifies a warrantless seizure and reasonable search of a motor vehicle lawfully stopped in transit or parked in a public place, whether or not exigent circumstances prevailed at either the time of the seizure or the time of the search.")

    b.  <u>Inventory Search</u>

Officers reasonably decided to impound the SUV and they conducted a lawful inventory of the vehicle pursuant to Concord Police Department policies.  *See* Defendant's *Motion*, Exhibit A, D.E. 46-2, p 15-6 (creating a written inventory of the contents of the vehicle in the presence of the driver).  Hence, the inventory search is a legal means of inevitable discovery of the incriminating evidence from the SUV.

The decision to impound the defendant's vehicle was reasonable under the circumstances as a lawful exercise of officers' community caretaking responsibilities. *See Pascu*, 2012 WL 2449905, at *11; *United States v. Davis*, 909 F.3d 9, 17 (1st Cir. 2018). Officers learned at the scene that the SUV bore a Colorado license plate, and that Defendant and Gamez Rodriguez were from Florida, were visiting a friend in Lowell, and were on their way to the airport. *See* Defendant's *Motion*, Exhibit A, D.E. 46-2, pp 6, 9-10. On the basis of the information available to them, officers reasonably concluded that no one else was immediately available to take custody of the SUV following the arrests of both Defendant and Gamez Rodriguez. *See United States v. Coccia*, 446 F.3d 233, 240 (1st Cir. 2006). Because SUV was parked directly in front of a gas pump at a gas station that was opening shortly, and because officers did not know when Defendant and Gamez Rodriguez would be able to return to it, officers had a substantial noninvestigatory reason to impound the SUV to prevent it from being a disruption to the business or disposed of as abandoned property. *See Pascu*, 2012 WL 2449905, at *11. In light of the deference granted to police caretaking procedures and Defendant's diminished expectation of privacy in the SUV, the officers properly impounded the SUV. *See Colorado v. Bertine*, 479 U.S. 367, 372 (1987).

A warrantless search of an automobile is permitted under the Fourth Amendment if it is carried out pursuant to a standardized inventory policy. *See Illinois v. Lafayette*, 462 U.S. 640, 647–48 (1983). Here, the Concord Police Department has such a policy and officers conducted its inventory search of the vehicle in accordance with its procedure. *United States v. Hawkins*, 279 F.3d 83, 86 (1st Cir. 2002) (finding an inventory search valid "because the inventory was conducted in accordance with [officers'] standard procedure"). Defendant does not dispute this

fact.[5]   Therefore, officers acted lawfully when the recovered the incriminating evidence from the

SUV, and the discovery of the evidence was inevitable.

III.    *The search warrant for the hotel room gave officers authority to lift the lid of the laptop*
        *to search for evidence between the screen and the keyboard.  Subsequent observations*
        *made of the screen were lawful based on the plain view doctrine.*

a.   <u>Plain View</u>

Based in part on information obtained in connection with the stop and arrest of Defendant

at the Concord Rotary Gulf that same morning, a magistrate of the Concord District Court issued

a search warrant for Room 328 of the Motel 6 in Framingham, Massachusetts, on November 17,

2019.  *See* Defendant's *Motion*, Exhibit B, D.E. 46-3.  The warrant authorized officers to search

the hotel room for, and seize:

> any and all evidence of fuel pump and ATM skimmer possession, transport,
> installation, manufacturing, transmission and data collection; including cellular and
> smart telephones, electronic smart devices such as iPads, tablets, iPhones,
> computers, laptop computers, Bluetooth devices, NFC communication devices,
> Apple Pay and Android Pay devices, Google and Samsung Pay devices, Pay Pal
> pay devices, VENMO and ZELLE payment capable devices.

*Id*. at ¶ 28.  Police officers complied with these terms during the search of the hotel room.

Specifically, they seized, but did not search, a Dell laptop belonging to Defendant.  Officers

properly lifted the lid of the laptop to search the space between the screen and the keyboard for

"evidence of fuel pump and ATM skimmer possession, transport, installation, manufacturing,

transmission and data collection."  Information that appeared on the screen as a result of that action

---

[5] The Government produced the Concord Police Department's Motor Vehicle Inventory
policy to Defendant on March 19, 2021.  *See United States v. Allen*, 573 F.3d 42, 54 (1st Cir. 2009)
(district court properly denied the defendant's motion for an evidentiary hearing where affidavit
submitted in support of motion to suppress failed to adequately contest government's claims or
version of events, which had been disclosed to the defendant at the outset of the case).

was lawfully observed and seized, and the information should be admissible under the plain view doctrine.

The "plain view" doctrine allows the police to seize evidence without a warrant so long as (1) the evidence is in "plain view," (2) the police are legitimately on the premises where the evidence is seized, and (3) the evidence is immediately and apparently connected to the criminal activity.  *Coolidge v. New Hampshire*, 403 U.S. 443, 464-73 (1971).

The First Circuit has ruled that officers may search containers for items described in a search warrant if it "is reasonable to believe that the container could conceal items of the kind portrayed in the warrant." *United States v. Rogers*, 521 F.3d 5, 9-10 (1st Cir. 2008) (quoting *United States v. Gray*, 814 F.2d 49, 51 (1st Cir. 1987) (internal quotation mark omitted).  In *United States v. Crooker*, the First Circuit denied a motion to suppress ammunition seized under the plain view doctrine from inside a tackle box, holding that officers were permitted to check the interior of the tackle box pursuant to a warrant authorizing them to search for evidence of biological weapons (*i.e.* grains of ricin powder) that could reasonably have been concealed inside. 688 F.3d 1, 8 (1st Cir. 2012).

It was reasonable for officers to believe that "evidence of fuel pump and ATM skimmer possession, transport, installation, manufacturing, transmission and data collection" would be found within the space between the laptop keyboard and screen."  Indeed, evidence of the credit card skimming scheme – two SIM cards – were discovered hidden between pages in a Bible in the hotel room.  *See* Defendant's *Motion*, Exhibit F, D.E. 46-7, ¶30(k) (filed under seal).  Officers understood that SIM cards are components NFC communication devices, and they are expressly included within the scope of the warrant.  *See, e.g.,* Defendant's *Motion*, Exhibit C, D.E. 46-4, ¶¶ 28-30 (discussing officers' knowledge of how NFC communication devices like smart phones are

commonly used for credit card skimming).  Small enough to fit within a Bible, SIM cards could also fit between the screen and keyboard of a closed laptop.  The officers were within their authority to open the laptop to ensure that there was no evidence concealed between the screen and the keyboard.

Officers were lawfully in the hotel room executing a search warrant for evidence of credit card skimming when the laptop screen activated and display incriminating evidence in plain view. *United States v. Owens*, 167 F.3d 739, 746 (1st Cir. 1999) (drugs and drug paraphernalia were properly seized pursuant to the plain view doctrine, as officers were lawfully on the premises executing a search warrant for firearms and ammunition), citing *Horton v. California*, 496 U.S. 128, 136 (1990); *cf. Arizona v. Hicks*, 480 U.S. 321, 328 (1987) (incriminating character of stereo equipment not immediately apparent because officers needed a further search – moving the equipment – to expose the serial numbers).  Specifically, the evidence consisted of Defendant's name and signal showing that the device was Wi-Fi capable.  *See* Defendant's *Motion*, Exhibit F, D.E. 46-7, ¶32 (filed under seal).  The incriminating nature of these observations were immediately apparent.  The name suggested that the device belonged to Defendant, and the device's Wi-Fi signal indicated that it may be an instrumentality of Defendant's credit card skimming scheme. *Id.* at ¶¶ 32, 40-41. Therefore, this evidence was lawfully obtained under the plain view doctrine.

Even if viewing the activated screen of the laptop constitutes an unlawful search, the information gained would have inevitably been discovered.  Officers secured a follow-on warrant to search the data stored on the device based on ample probable cause, even without the information from the laptop's screen.  *See* Defendant's *Motion*, Exhibit F, D.E. 46-7 (filed under seal).

Under the circumstances, all three prongs of the inevitable discovery doctrine are satisfied. Officers possessed probable cause for the follow-on search warrant for the laptop independent of the evidence gained from the observations of the screen; discovery of the information displayed on the screen was truly inevitable because it was necessarily stored as data in the laptop itself, and the laptop was secured in police custody; and allowing this information would not undermine the safeguards of the Fourth Amendment.

Excising the observations of Defendant's name and the Wi-Fi signal from the affidavit submitted in support of the application for the laptop search warrant would not render the application deficient. *Id.* The laptop was connected to Defendant and skimming activity by Motel 6 records of the room registration in his name and his use of the same hotel room on numerous prior dates that corresponded with instances of reported credit card skimming. *Id.* at ¶¶ 28-29, 34. In addition, after Defendant was arrested, an employee of the hotel received a telephone call from someone identifying as Defendant's brother and claiming that Defendant had been in an "accident" and would not be returning to Room 328. *Id.* at ¶ 28. The laptop's Wi-Fi functionality was also independently established by the affiant's training and experience. *Id.* at ¶ 47 ("I am aware, based on my training and experience, that the laptop in question in this case are all Bluetooth and Wi-Fi enabled smart devices."). Notably, nothing on the laptop screen had indicated Bluetooth functionality, and officers believed that Defendant was using Bluetooth devices in furtherance of the skimming scheme. *Id.* at ¶36. Therefore, probable cause for the laptop search warrant did not depend on observations of the laptop screen made during the execution of the hotel search warrant.

The First Circuit has previously found the inevitability requirement satisfied in similar circumstances. In *United States v. Hughes*, discovery of images on the defendant's laptop was determined to be inevitable because defendant could no longer access the laptop in question, and

because officers knew the type of information they were seeking from another source. 640 F.3d 428, 441 (1st Cir. 2011).   Here, the laptop had been secured by officers within 24 hours of Defendant's arrest, and therefore the device could not be altered or manipulated by Defendant or any accomplices or co-conspirators.   Based on the ongoing investigation, officers further knew that they were looking for electronic devices associated with perpetrators of credit card skimming, including laptops, and that those devices likely contained evidence of credit card skimming activity.  *See* Defendant's *Motion*, Exhibit B, D.E. 46-3, ¶¶ 25-8.

As demonstrated by the submissions to the Court, the Concord Police Department's credit card skimming investigation of Defendant and others was already underway, and officers were pursuing multiple avenues of investigation when the search warrant was executed on Defendant's hotel room. The existence of the investigation and the actions of the officers are demonstrated historical facts capable of ready verification or impeachment.  *See Nix*, 467 U.S. at 444 n. 5. Because Concord police officers independently established probable cause that the laptop more likely than not was an instrumentality of the skimming scheme and contained evidence of the skimming scheme, it was inevitable that the officers would have found the same information observed on the screen also stored within the laptop, by virtue of a follow-on search warrant.

Application of the inevitable discovery exception to the exclusionary rule to the evidence observed on the laptop screen would not "sully the prophylaxis of the Fourth Amendment."  *See United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994).   There is no evidence of bad-faith by police officers executing the warrant at the hotel room, and, under the circumstances, they had no incentive to test constitutional boundaries.   Like the contents of the SUV, there were plainly alternative, lawful means of obtaining the data from the laptop, including forensic attribution evidence of its owner – namely, a search warrant.   As has been established, officers did not need

the observations of the information displayed on the laptop screen to secure a warrant for the laptop's digital contents.  Therefore, exclusion of those observations provides no deterrence effect and is not required.  *See Almeida*, 424 F.3d at 29.

IV.    Defendant has failed to demonstrate that any material facts are in dispute, and he is not entitled to a hearing.

The evidence before the Court on Defendant's *Motion* consists entirely of sworn and unsworn statements by law enforcement officers involved in the investigation and arrest of Defendant.  Defendant has not submitted any affidavits of witnesses or other evidence in support of his *Motion*.  Indeed, he relies principally on the police narratives in fashioning his legal arguments for suppression, while qualifying his use of these facts as "not necessarily" an endorsement of their truth.  *See* Defendant's *Motion*, p 2 fn 2.  If Defendant has not essentially adopted the Government's version of events, he has not disputed it, either.

"The test for granting an evidentiary hearing in a criminal case [is] substantive: did the defendant make a sufficient threshold showing that material facts were in doubt or in dispute?" *United States v. Vilches-Navarette*, 523 F.3d 1, 15 (1st Cir. 2008) (quotation marks and citation omitted).  On a motion to suppress, a defendant must demonstrate the existence of a substantial constitutional claim by proffering specific facts plausibly suggesting that the police action was unlawful.  *See Allen*, 573 F.3d at 51.  Here, Defendant has not proffered any facts.  In *United States v. Calderon*, 77. F.3d 6 (1st Cir. 1996), the First Circuit affirmed the district court's decision to forego an evidentiary hearing on a motion to suppress where the defendant "vaguely claim[ed]" that a consent to search was "coerced or was otherwise ineffective," but "offer[ed] no affidavit or statement . . . to that effect, describe[d] no circumstances supporting his assertion, and ma[de] no offer of proof relative to any other facts that might support his assertion." 77 F.3d at 9.  The Court

is faced with a motion like the one the district court in *Calderon* summarily resolved, and it should reach the same conclusion.

A defendant generally must cite to more than the Government's discovery in order to allege sufficient facts entitling him to relief. *See Allen*, 573 F.3d at 52 (vague allusion to "reports provided in discovery" insufficient to generate a material factual dispute); *United States v. Rogers*, 481 Fed. Appx. 157, 159 (5th Cir. 2012) (photograph evidence and signed statement of the defendant made "sufficiently definite" allegations demonstrating that he had a "substantial claim"); *United States v. Franklin*, 2005 WL 2177120 (D. Mass. Sept. 9, 2005) (Zobel, J.) (defendant's affidavits sufficiently specific to raise factual issues as to consent and probable cause); *United States v. Marquez*, 367 F. Supp. 2d 600, 603 (S.D.N.Y. Apr. 27, 2005) (defendant submitted affidavit by person with knowledge of facts of traffic stop raising material factual question as to whether the defendant committed the lane change violation alleged in the complaint).

The linchpin of Defendant's suppression motion is the notion that Sgt. Landers did not have reasonable suspicion to stop him at the Concord Rotary Gulf gas station when Sgt. Landers first arrived on scene. Yet, the only account of those moments before the Court is Sgt. Landers' detailed report and sworn statements by police officer witnesses in search warrant affidavits. Defendant proffers no alternative descriptions of his actions, Sgt. Landers' actions, what was said and by whom, or the sequence of events. The facts surrounding Defendant's stop and arrest are essentially uncontested. Similarly, Defendant does not proffer facts calling into question the reasonableness of the impoundment of the SUV or the subsequent inventory search, or disputing the sworn statements of officers regarding the condition of the Dell laptop when they found it in the hotel room. His allegation that officers conducted a "search" of the laptop is merely conclusory

and speculative, and it does not contradict the officers' accounts on a factual level.  In sum, Defendant's *Motion* fails to allege facts that are sufficiently definite, specific, detailed, and nonconjectural to enable the Court to conclude that a substantial claim was presented.  *See United States v. Lewis*, 40 F.3d 1325, 1332 (1st Cir. 1994).  An evidentiary hearing need not be convened if there are no material facts in dispute and the issues are able to be summarily decided without additional fact-finding.  *Id*.

V.     Even if the *Terry* stop and frisk were determined to be unlawful, the evidence obtained from the execution of search warrants should not be suppressed because the "good faith" exception to the exclusionary rule applies.

Defendant argues that evidence obtained from officers' execution of search warrants at the hotel, *see* Defendant's *Motion*, Exhibit B, D.E. 46-3, on Defendant's phone, the iPhone XR, *see* Defendant's *Motion*, Exhibit C, D.E. 46-4, on the black Samsung cell phone from the SUV, *see* Defendant's *Motion*, Exhibit D, D.E. 46-5, on T-Mobile for historical cell site location information associated with Defendant's phone, the red iPhone with the DeWalt sticker, *see* Defendant's *Motion*, Exhibit E, D.E. 46-6, and on the Dell laptop computer, *see* Defendant's *Motion*, Exhibit F, D.E. 46-7, are all tainted by the unlawful *Terry* stop and frisk, and should be suppressed.  While the affidavits in support of these warrants do rely in part upon information derived from the *Terry* stop and frisk, even if Sgt. Landers' actions violated Defendant's constitutional rights, that is not the end of the inquiry.  The "good faith" exception to the exclusionary rule should apply because the officers executing the warrants reasonably relied upon the issuing magistrates' determinations and the objectively reasonable belief in the validity of the *Terry* stop and frisk.

The Supreme Court held in *United States v. Leon*, 468 U.S. 897 (1984), that evidence obtained pursuant to a seemingly valid search warrant that was later found to be defective for lack of probable cause was admissible because the officers had reasonably relied on the magistrate's determination that the warrant was supported by probable cause.  This "good faith" exception to

26

the exclusionary rule does not apply in limited circumstances involving bad faith by law enforcement or the court, or patently deficient warrant materials, none of which are present here. *Id.* at 923.

The First Circuit has applied the *Leon* good faith exception to cases involving search warrants applications that were supported by tainted evidence directly or indirectly obtained as a result of unconstitutional law enforcement actions. *See United States v. Bain*, 874 F.3d 1 (1st Cir. 2017); *United States v. Diehl*, 276 F.3d 32 (1st Cir. 2002). In *Bain*, an officer tested a key in an apartment door lock, mistakenly believing that he could lawfully do so on the basis of a reasonable suspicion alone. 874 F.3d at 22. Similarly, in *Diehl*, an officer unintentionally made a warrantless entry into the curtilage of a property to conduct a thermal detection inspection of a building. 276 F.3d 42-43. In both cases, the First Circuit relied on the officers' oversights and lack of deliberate misstatement or evidence of bad faith in refusing to impose the remedy of exclusion. *Id.* at 44; 873 F.3d at 23.

Here, the officers were forthcoming about Sgt. Landers' grounds for the *Terry* stop and frisk in the search warrant applications, thus giving the issuing magistrates an opportunity to determine whether Sgt. Landers acted "in such bad faith as to preclude a warrant." 276 F.3d at 43. Officers furnished complete and accurate information about the events that led to Defendant's arrest to the issuing magistrates. 873 F.3d at 21. Clearly, Sgt. Landers did not act in a deliberately unreasonable or flagrant manner. If Sgt. Landers violated the Defendant's constitutional rights, his actions, like those of the officer checking the key in the apartment door in *Bain*, were sufficiently close to the line of validity that the police could rely in good faith on the search warrants. *Id.* at 23. The evidence from the search warrants Defendant seeks to suppress, therefore, should not be subject to the exclusionary rule.

**CONCLUSION**

For all the foregoing reasons, the Court should find that officers did not violate Defendant's constitutional rights on November 17, 2019 at the Concord Rotary Gulf gas station and at Motel 6, or at any time relevant to Defendant's *Motion*, and that Defendant failed to demonstrate any factual dispute entitling him to an evidentiary hearing.  Accordingly, Defendant's *Motion* should be denied on all grounds.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By:   *Fred M. Wyshak, III*
Fred M. Wyshak, III
Assistant United States Attorney

Date:   July 31, 2021

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those indicated as nonregistered participants on July 31, 2021.

By:   *Fred M. Wyshak, III*
Fred M. Wyshak, III
Assistant U.S. Attorney